UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEITH LAWSON,<br><br>       Plaintiff,<br><br>  v.<br><br>PARAMOUNT GLOBAL, et al.,<br><br>       Defendants. | 24 Civ. 3315 (DEH)<br><br>**MEMORANDUM**<br>**OPINION AND ORDER** |

DALE E. HO, United States District Judge:

  Plaintiff Keith Lawson ("Plaintiff" or "Lawson") brings this action against Defendants Paramount Global and Black Entertainment Television LLC (collectively, "Defendants"). On September 26, 2025, Plaintiff requested a Rule 37.2 Conference, ECF No. 39, to compel production of certain documents and correspondence created and/or received by an attorney for Defendants, which Defendants have withheld on the grounds of attorney-client privilege. Following the Rule 37.2 Conference, this Court ordered the parties to file briefing justifying their respective positions with record evidence to assist the Court in ruling on Plaintiff's Motion to Compel. ECF No. 44. For the reasons discussed herein, Plaintiff's Motion is **GRANTED**.

## BACKGROUND

  Lawson began working for Defendant Black Entertainment Television LLC ("BET") in 1992 as a writer/production assistant and was eventually promoted to Senior Vice President of Brand Solutions. Compl. ¶¶ 18-19, ECF No. 1. In 2023, Lawson and Defendants entered into a written employment agreement that was to continue until 2025, and which set forth the terms and obligations of the parties should Lawson be terminated for Cause or without Cause. *Id.* ¶¶ 21-23. According to the agreement's terms, if Defendants were to terminate Lawson without Cause, Lawson would be entitled to significant financial protections, including a portion of his salary, his

annual bonus for the remaining years on the contract, accelerated vesting of equity already granted to him, and various company-covered insurance options, including COBRA. *Id.* ¶ 24.

In July 2023, Defendant Paramount began an investigation into Lawson after an actress with whom Lawson had worked closely filed a formal complaint alleging harassment. *Id.* ¶¶ 26-35. During this investigation, Jennifer Gordon, Vice President of Employee Relations, met with Lawson and reviewed "the facts, texts, emails and documents, and interviews . . . [with] individuals who were likely to be familiar with the situation." *Id.* ¶¶ 37-41; Pl. Mem. Law Supp. Mot. Compel, Ex. A, 3, ECF No. 49-2 (hereinafter "Pl. MOL Supp."). This investigation appears to have been closed on August 25, 2023 when Gordon sent the actress a closure memo outlining the steps Defendants took to address the actress's concerns, including a verbal reprimand of Lawson. Pl. MOL Supp., Ex. A.

At some point in the days following this communication with the actress, however, Defendants re-opened their investigation into Lawson. On August 29, 2023, Gordon requested another meeting with Lawson to discuss the matter, this time including Fania Washington, Paramount's Senior Vice President of Employment Law. *Id.* Ex. C, ECF No. 49-4. By all accounts, the subject of that meeting was the existence of additional evidence that Lawson may have withheld—intentionally or unintentionally—from the initial investigation. Compl. ¶¶ 42-44; Pl. MOL Supp., Ex. B, ECF No. 49-3, at 259:12-260:24. But the extent and purpose of Washington's inclusion in the call is disputed. Pl. MOL Supp., Ex. D, ECF No. 49-5, at 268:20-269:12; Def. Mem. Law Opp'n Mot. Compel, Ex. 2, ECF No. 49-19, at 29:10-19 (hereinafter "Def. MOL Opp'n"). From this point moving forward, Washington was included on nearly all communications between Lawson and Gordon; these communications detailed various facts related to the incident between Lawson and the actress, and Washington responded directly to several of them. Pl. MOL Supp., Exs. E-K, ECF Nos. 49-6-12; *but see*, Def. MOL Opp'n, Ex. 5,

ECF No. 49-22.  Washington also gathered evidence from the actress's manager, and "completed . . . [an] internal review of the documents," Pl. MOL Supp., Ex. L, ECF No. 49-13, because Gordon was "looking to [Washington] to . . . handle because the matter has now been escalated."  *Id.*, Ex. M, ECF No. 49-14.  On September 29, 2023, Lawson was terminated for Cause, purportedly for failure to cooperate in the investigation and for destroying evidence.  Compl. ¶ 53-54.

On April 30, 2024, Lawson filed this lawsuit alleging various contract-based claims, lost wages, and gender discrimination.  *Id.* at ¶¶ 86-111.  In response, Defendants pleaded, among others, three affirmative defenses that the employment decisions were legitimate and non-discriminatory, that Defendants acted in good faith, and that Defendants complied with established policies and procedures to prevent discriminatory and harassing behavior.  Answer at 12.

During discovery, Defendants have withheld several documents and communications created by or including Washington that relate to the investigation of Lawson, asserting that these materials are protected by the attorney-client privilege.  Lawson seeks only those documents and communications involving Washington that were developed after August 25, 2025—i.e., when the investigation was re-opened and, he argues, Washington became a fact-finder.

## LEGAL STANDARD[1]

"Federal district courts have broad discretion in ruling on a motion to compel discovery." *Felder v. Warner Bros. Discovery, Inc.*, 23 Civ. No. 08487, 2025 WL 1718098, at *3 (S.D.N.Y. June 20, 2025).  When deciding whether information is discoverable, the court "consider[s] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Rule 26(b)(1).  Whether information is relevant is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

"To satisfy this standard, the moving party must articulate a concrete linkage between the discovery sought and the claims or defenses asserted in the case." *Ekstein v. Poito Assoc.*, No. 20 Civ. 1878, 2022 WL 783000, at *3 (S.D.N.Y. Mar. 15, 2022).  The party seeking discovery has the initial burden to prove relevancy and proportionality, but once this showing has been made, "the burden shifts to the opposing party to justify curtailing discovery." *Sportsvision, Inc. v. MLB Advanced Media, L.P.* No. 18-CV-3025, 2022 WL 2817141, at *1 (S.D.N.Y. July 19, 2022).

## DISCUSSION

There is no real dispute as to whether the communications and documents at issue are relevant and proportional, and thus discoverable.  The only issue before the Court is whether they are protected from disclosure by attorney-client privilege.  Lawson argues that they are not, for two reasons.  First, Lawson argues that these communications are not protected by the privilege because Washington was not acting as a lawyer, but rather a fact-finder.  Second, he argues that, even if the documents are protected by the privilege, Defendants have waived the privilege by asserting three affirmative defenses that put the protected information at issue.  These arguments are discussed in turn below.

**I.    Acting as Counsel**

The burden of establishing attorney-client privilege rests on the party asserting the privilege, who must show that the communications were "(1) between a client and his or her attorney (2) intended to be, and in fact were, kept confidential [and] (3) [made] for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F. 3d 126, 132 (2d Cir. 2011).

"[C]ourts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Id.*  For example, as to the third element, communications must be made with the *sole* purpose of obtaining or providing legal advice to be covered by the privilege. *Shaeffler v. United States*, 806 F. 3d 34, 40 (2d Cir. 2015) ("Communications that are made for purposes of evaluating the commercial wisdom of various options as well as in getting or giving legal advice are not protected.").

      Defendants argue that the information Lawson seeks is covered by attorney-client privilege because Washington's involvement was strictly for the purpose of providing legal advice to Gordon. Def. MOL Opp'n 1, ECF No. 49-17.  Defendants say that Washington's inclusion on any emails or meetings with Lawson "was to impress upon Plaintiff the importance and seriousness of his cooperation with Gordon's investigation." *Id.*  Indeed, Lawson testified at his deposition that he "had most of my conversations with [Gordon] in terms of evidentiary" matters, and that "[t]he conversations that involved [Washington] were pretty much why did you do this, why did you delete" certain items. *Id.* at 2, Ex. 1, ECF No. 49-18, at 79:13-18.  Gordon also testified that she consulted Washington for legal advice during the investigation and that she included Washington in the call with Lawson so she could explain to him why additional information was needed. *Id.*, Ex. 2, ECF No. 49-19, at 29:10-19 & 30:10-21.  Others also testified that Washington provided legal advice during the investigation. *Id.*, Ex. 3, ECF No. 49-20, at 213:6-13; Ex. 4, ECF No. 49-21, at 143:19-144:7.  Thus, Defendants have made a showing that Washington provided legal advice during the course of the investigation.

      Once the investigation was re-opened after August 25, 2023, however, Washington appears to have also served as a fact-finder.  Washington was included in at least one meeting with Lawson where the discussion focused on undisclosed evidence. Pl. MOL Supp., Ex. B at 259:12-260:24.  In that meeting, Washington appears to have asked why certain evidence was missing.  Def. MOL

Opp'n, Ex. 1 at 79:13-18. Defendants contend that this type of questioning is distinct from fact-gathering about the underlying incident of harassment, but the basis of Lawson's termination is purportedly a lack of cooperation with the investigation and destruction of evidence. As such, understanding whether, and why, certain evidence was missing appears to have been critical information considered in the ultimate determination to terminate Lawson's employment.

Washington also appears to have been put, at least to some degree, in charge of the investigation once the matter was escalated after August 25. Pl. MOL Supp., Ex. M. Around that time, Washington told the actress's agent that Gordon was deferring to her to handle matters moving forward. *Id.* Additionally, Washington seems to have been the only person involved in the post-August 25 investigation that gathered and reviewed evidence from both Lawson and the actress, putting her in the unique position of being able to weigh all of the factual allegations. For example, Washington was included in virtually all, save one, email communications between Lawson and Gordon where important factual details surrounding the incident with the actress were shared. *Id.*, Exs. E-K; *but see*, Def. MOL Opp'n, Ex. 5. At the same time, Washington gathered and evaluated evidence that the actress shared with Defendants. Pl. MOL Supp., Ex. L.

Given the Court's obligation to construe the privilege narrowly, *see Mejia*, 655 F. 3d at 132, Defendants have not met their burden of showing that the withheld documents and communications were made for the sole purpose of obtaining or providing legal advice. *See Shaeffler*, 806 F. 3d at 40.

## II.  At-Issue Waiver

But even if the withheld discovery were covered by the attorney-client privilege, the Court would conclude that Defendants have waived the privilege. The attorney-client privilege may be waived implicitly by a defendant who asserts an affirmative defense that, to avoid unfairness, would require the inspection of an otherwise protected document. *United States v. Bilzerian*, 926

6

F. 2d 1285, 1292 (2d Cir. 1991) ("[T]he privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications"). This so-called "at-issue waiver" applies only to protected information that is relied on by the defendant to advance their affirmative defense. *In re Cnty of Erie*, 546 F. 3d 222, 229 (2d Cir. 2008). "The Second Circuit has not, however, specified the degree of reliance sufficient to trigger an at-issue waiver." *Abromavage v. Deutsche Bank Securities Inc.*, Case No. 18-CV-6621, 2019 WL 6790513 at *3 (S.D.N.Y. Dec. 11, 2019).

One "quintessential" at-issue waiver arises when a defendant asserts as a defense that they have acted in good faith, because reliance on the protected documents is a required element of those defenses. *Id.* Examples of good faith defenses include a defense that a defendant acted on the advice of counsel or a defense that defendants took good faith efforts to enforce an anti-discrimination policy (known as the *Kolstad* defense). *Id.* "[A] defendant invoking his good faith may place his privileged communications at issue even if he does not specifically plead or argue that he relied on an attorney's advice." *Id.* For example, a defendant claiming they believed to be acting within the bounds of the law may not withhold communications with their attorney about the legality of their actions, even if they do not specifically claim to have relied on that advice, because by raising the defense, they "put [their] knowledge of the law and the basis for [their] understanding of what the law required in issue." *Bilzerian*, 926 F. 2d at 1292. Even still, "the mere assertion of a good faith defense does not waive privilege; rather, forfeiture of this type is premised on the *unfairness* to the adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *Felder*, 2025 WL 1718098, at *14. This is decided on a case-by-case basis. *In re Grand Jury Proceedings*, 219 F. 3d 175, 183 (2d Cir. 2000).

Here, Defendants contend that the ultimate decision-maker did not rely on Washington's legal advice, but rather "merely consulted" her. Def. MOL Opp'n 3-4. Defendants further argue that even if there had been some sort of "reliance" on Washington, that would not constitute waiver, which they assert occurs only in other circumstances, such as when the relied-upon legal advice is divulged in the course of a deposition. *See id.* (citing *Kleeberg v. Eber*, No. 16-cv-9517, 2019 WL 2085412, at *8 (S.D.N.Y. May 13, 2019). But, as discussed above, Defendants need not argue that they relied on the legal advice of counsel for the Court to find waiver, which a court may find where defendants' defenses "put [their] knowledge of the law and the basis for [their] understanding of what the law required in issue." *Bilzerian*, 926 F. 2d at 1292.

The Court finds this to be the case here. The heart of Lawson's claim is whether Defendants had cause to terminate his employment. In response, Defendants' Sixth, Seventh, and Ninth Defenses assert they acted in good faith in that their employment decisions were legitimate and non-discriminatory, that Defendants acted without malice, and that Defendants complied with established policies and procedures to prevent discriminatory and harassing behavior (the "*Kolsted* defense"). In order to argue these defenses, Defendants must show that they acted within the bounds of the law and internal policies, which, as asserted in this case, in turn hinge on discussions with counsel. "[T]he attorney-client privilege cannot at once be used as a shield and a sword." *Id.* To withhold these documents from Lawson would be to prevent him the opportunity to show Defendants did not act in good faith. For these reasons, Defendants have waived attorney-client privilege to those documents and communications created after August 25, 2025.

8

## CONCLUSION

For the reasons stated above, Plaintiff's Motion to Compel is **GRANTED**. The parties shall file an amended Case Management Plan within seven days of this Opinion and Order.

SO ORDERED.

Dated: November 14, 2025

      New York, New York

_____
DALE E. HO
United States District Judge
